[Civ. No. 10284. First Appellate District, Division One.—January 11, 1938.]

GORDON JOHNSON, Respondent, v. CALIFORNIA IN-TERURBAN MOTOR TRANSPORTATION ASSOCIA-TION (an Unincorporated Association) et al., Appellants.

324

H. J. Bischoff, Hugh Gordon and Wallace K. Downey for Appellants.

Courtney L. Moore for Respondent.

THE COURT.—By this action the plaintiff, as the assignee of Thelen & Marrin, a firm of attorneys at law, and of Sanborn, Roehl & Brookman, another such firm, sought to recover the sum of $9,972.75 as a balance due said firms for legal services rendered and expenses incurred by them on behalf of defendants. Judgment went in favor of plaintiff and against all the defendants for the sum prayed, interest and costs. These have appealed from the judgment.

The court made findings of fact and conclusions of law. They are long and detailed. A brief outline of the main facts of the case will assist in understanding them.

In the years 1930 and 1931 C. S. McLenegan was president of Pioneer Express Company, having his office in San Francisco. He was also president of defendant California Interurban Motor Transportation Association (referred to herein as the association), which had as its secretary David G. Shearer, who resided in Los Angeles, having an office there in which, among his other activities, he performed his duties as such secretary. The association is unincorporated and is of a nonprofit character. Its membership consists of persons, corpo-

rations or partnerships engaged in the business of transporting goods and merchandise on the highways of the state by motor truck, which activities bring them under the jurisdiction of the railroad commission. Pacific Motor Transport Company is engaged in a similar business and is not a member of the association. Its method of operation differs from that of its competitors in that while they use motor trucks exclusively for transportation, it, in addition to employing these, makes use of the facilities of the Southern Pacific Company, its method being to collect the goods or merchandise from the shipper, assemble them in carload lots, which then move by railroad to a convenient point in the vicinity of their destination, from where they are transported by truck to the respective consignees.

The defendants—or at least those of them against whom judgment was given—are members of the association, and consist of two groups, the members of one of such groups being controlled by or affiliated with Pacific Freight Lines Company, this group being commonly referred to as Pacific Freight Lines, and the members of the other group being under similar control or affiliation of Southern California Freight Lines, Ltd. During the year 1930 and up to February, 1931, A. V. Wainwright was president of Pacific Freight Lines Company, and C. G. Anthony its vice-president, at which time Anthony succeeded to the presidency. These two gentlemen were also officers of its controlled companies. Of Southern California Freight Lines, Ltd., R. E. Connell was president, and Henry J. Bischoff chairman of its board of directors, and similarly these two held offices in its controlled subsidiaries.

In or shortly before the month of October, 1930, the Pacific Motor Transport Company filed with the railroad commission a tariff, reducing rates for its service between various points in northern California. Among these rates was one for transportation between San Francisco and San Jose and adjacent territory, in which the operations of the Pioneer Express Company were conducted. C. S. McLenegan, thinking there was possibly some illegality in the mode of operations of the Pacific Motor Transport Company, consulted an attorney, Paul S. Marrin, of the firm of Thelen & Marrin, and on his advice determined to bring suit before the railroad commission in an effort to establish the unlawfulness of those operations. As the question involved was one which interested

highway carriers generally, in conference between McLenegan and Marrin it was agreed it would be advisable to have others of them join in the proceeding; particularly was it thought desirable to use the name of the association as a complainant. McLenegan as president of the association had no authority to authorize this, the management of the association's affairs being in the board of directors and, between meetings of that body, in the hands of the executive committee. He so informed Marrin, and that he would seek authority from that body for such use. He was not able to obtain it, but in a conversation with Secretary Shearer was reminded by him that, by virtue of a resolution contained in the minutes of the association, any member thereof had the privilege of using its name in proceedings before the railroad commission, on condition, however, that he himself bore the expense of the proceeding and did not engage the responsibility of the association. Satisfied to act upon this, McLenegan immediately informed Marrin that he had talked with Shearer and that in Shearer's opinion it was proper to make the desired use of the association's name. Without further inquiry Marrin joined the association as a party complainant.

Before rendering his opinion to McLenegan on the advisability of bringing the proceeding Marrin had consulted with A. B. Roehl of the law firm of Sanborn, Roehl & Brookman, and had asked him if he would be willing to be associated with Marrin's firm in the event a proceeding should be commenced. Roehl agreed; and, having among his clients two highway carriers,—Valley Motor Lines, Inc., and United Motor Transport Lines, Inc.—brought the matter of the contemplated proceeding to their attention, and these consented to appear as complainants therein. The proceeding was thereupon commenced, the firm of Sanborn, Roehl & Brookman appearing in the complaint as attorneys for the two carriers last mentioned, and Thelen & Marrin so appearing for Pioneer Express Company and the association. Marrin had been given no authority to associate any attorney with him; Roehl apparently assumed that he had; in any event he made no inquiry into the matter; and thereafter the two firms cooperated, freely consulting one another and working on the preparation of the case in common. This, of course, would have been a perfectly natural and usual thing to do without this formal association, since all the complainants had a common interest in the questions involved. As regards the

members of the association, they appeared in the proceeding merely by the attachment to the complaint of a list of their names, and the complaint contained a reference thereto and an allegation that they were such members.

On December 12, 1930, a meeting of attorneys and clients was held in Marrin's office to consider the question of fees and expenses. It was attended by Mr. Sanborn, of Sanborn, Roehl & Brookman, by the clients of this firm—Messrs. Harms and Frasher, who owned or controlled Valley Motor Lines, Inc.,—Mr. Marrin and Mr. McLenegan. The attorneys stated that they would charge for their services at the rate of $100 per day for the actual number of days they had devoted or should in the future devote to the case, and must in addition be reimbursed for certain contemplated expenses. They estimated that these fees and expenses would amount to $5,000, and requested their clients to take steps to get contributions from various carriers throughout the state in order to furnish this amount. The attorneys were aware that this was the method by which the complainants (other than the association) expected to procure funds to meet the expense of the litigation. McLenegan undertook the task of collecting the funds. On the same date Marrin addressed to McLenegan a letter confirming the attorneys' estimate of the cost and the scale of fees proposed to be charged by them.

On March 4, 1931, C. G. Anthony wrote to the railroad commission, requesting that the Pacific Freight Lines group be eliminated from the proceeding.

On April 6, 1931, at which time no trial of the proceeding before the railroad commission had yet been had, Mr. Anthony and his attorney, Reginald L. Vaughan, held a conference with attorneys Roehl and Marrin in the office of the former for the purpose of having them place at their disposal certain data prepared for use in such trial by Grove C. Foster, who had been employed by Roehl and Marrin for that purpose. They wished to make use of this data in applying to the commission for the suspension of a new rate filed with the commission by Pacific Motor Transport Company and which, if put in operation, would seriously affect the business of Imperial Valley-Los Angeles Express, one of the corporations composing the Pacific Freight Lines group. They also requested the assistance of W. H. Kessler, an attorney associated in the office of or employed by Roehl. These requests were granted by Roehl and Marrin on condition that Anthony re-

enter his group of companies in the pending proceeding and contribute to the expense thereof. To this demand Anthony acceded, stating that it had always been the intention of his companies, although for certain reasons he had withdrawn their names from the proceeding, to bear their share of such expense. Thereafter Vaughan, acting under the instructions of Anthony, wrote to the railroad commission formally withdrawing the previous withdrawal of the Pacific Freight Lines group of companies.

In his efforts to collect funds to defray the expense of the litigation McLenegan wrote numerous letters to highway carriers, including officers and members of the association. Therein he informed them that he, as president of Pioneer Express Company, through his attorneys, Thelen & Marrin, in conjunction with Valley Motor Lines, Inc., and United Motor Transport Lines, through their attorneys, Sanborn, Roehl & Brookman, had initiated the litigation and that those three concerns were responsible for the expense thereby occasioned; but that as all carriers, including the members of the association, were equally interested in the questions at issue, and as the cost thereof would be more than the three complainants mentioned could bear, he felt that all highway carriers affected by the increasing competition of Pacific Motor Transport Company should share in that expense. In his campaign for contributions he enlisted the aid of Secretary Shearer; and both in personal interviews with members, either at meetings of the association or on other occasions, solicited their financial assistance, and in doing so kept them informed of the different steps taken in the proceeding, and also apprised them of the estimate given by the attorneys of the amount of the expense and of the rate of compensation to be charged by them. In these contacts with officers and members of the association he at all times gave them to understand that he had made it quite clear to his attorneys that the Pioneer Express Company and its two co-complainants above mentioned were alone responsible for the cost of the litigation.

McLenegan was but partially successful in the collection of funds. Pioneer Express Company contributed $1,000, Valley Motor Lines, Inc., the same amount, and other contributions amounted to $445. These amounts were paid over to the attorneys.

The trial of the proceeding in the railroad commission took place in the month of May, 1931, and at that time the demands of the attorneys, made through Marrin, for payment of fees and expenses became insistent. At this juncture McLenegan conceived the idea that he might be more successful in collecting funds from members of the association if he requested from each of them a specific amount, which he determined by applying a percentage figure to the gross receipts of that member's business. McLenegan had no authority to levy an assessment on the members, and his adoption of this method did not purport to be such. The change of procedure was unavailing; in fact, it introduced a new obstacle to success, since it gave to members the opportunity to dispute the correctness or the justice of the amount requested. No more funds were collected.

On the termination of the litigation a bill or account for services and expenses, showing a balance due of $9,772.75, was sent by Thelen & Marrin, addressed to C. S. McLenegan, care of Pioneer Express Company. It was in the joint names of the law firms we have named, and was made out to Pioneer Express Company, Valley Motor Lines, Inc., United Motor Transport Lines, the California Interurban Motor Transportation Association and Pacific Freight Lines Company, and was stated to be for "legal services rendered to date in the above entitled action in accordance with the terms of employment set forth in the letter addressed to Mr. C. S. McLenegan dated May 12, 1930". Payment not being forthcoming, the present action was brought. Neither the Pioneer Express Company, Valley Motor Lines, Inc., nor United Motor Transport Lines was made a party defendant, the only concerns sued being the association, the two groups of member carriers above mentioned, and one or two carriers alleged to belong to one or other of these groups.

We come now to the findings of fact and conclusions of law made by the trial court. They are quite long and extremely detailed. Summarized, they are generally to the effect that McLenegan on November 25, 1930, notified the law firms of Thelen & Marrin and Sanborn, Roehl & Brookman "that it was proper to use the name of the California Interurban Motor Transportation Association as a party complainant" in the proceeding before the railroad commission, and that on the following day he informed David G. Shearer, secretary of the association, that a complaint had been pre-

pared and filed naming said association and its members as parties complainant, and that said two law firms were appearing as attorneys for the association; that on the same day, November 26th, a meeting of the legislative committee of the association was held, among the members of which were R. E. McConnell and H. F. Bischoff, respectively president and chairman of the board of directors of Southern California Freight Lines, which by stock ownership controlled five of the defendants named herein; that Shearer informed said legislative committee that said complaint would be filed and that it was proposed to join the association and its members as parties complainant, and that as a result of said meeting the executive committee of the association had full knowledge of the foregoing facts; that no action was taken by said committee disavowing the acts of the president and secretary, or denying McLenegan's authority in employing attorneys to represent the association and its members. That on December 3, 1930, McLenegan had a meeting with A. V. Wainwright, who at that time was president of defendant Pacific Freight Lines Company, which by stock ownership or other affiliation controlled seven other of the defendants herein, and that as the result of his conversation with Wainwright said Pacific Freight Lines Company and its affiliates were fully informed that said proceeding had been commenced in the name of the association and on behalf of its members. That on December 8, 1930, the complaint in the proceeding was amended and a copy of it sent by McLenegan to Shearer, as a consequence of which said Shearer, as secretary of the association, had full and complete knowledge thereof, that the association and its members were named therein as complainants, and that the said two law firms appeared as attorneys of record for said association and its members. That on December 12, 1930, said law firms made and entered into an agreement with the association, establishing a scale of charges for their services and for payment of expenses to be incurred in the litigation. That on December 13, 1930, McLenegan wrote Shearer, quoting in full a letter written to him on the preceding day by Paul S. Marrin, of the firm of Thelen & Marrin, confirming said arrangement in regard to fees, and instructed said Shearer to take steps immediately for the purpose of raising the funds which would be needed, and that the association and its members thus had full and complete knowledge of the facts concerning the litigation

already detailed, and of the basis of fees to be charged for attorneys' services. That on the same day McLenegan wrote to Wainwright and McConnell a similar letter; that Wainwright replied thereto and did not in his reply, nor at any time, disavow the acts of McLenegan; that McConnell also replied, expressing his opinion that said litigation was hopeless and that the companies represented by him did not desire to participate therein. That a meeting of the executive committee of the association was held on January 8, 1931, at which were present various members of the association, including Messrs. Wainwright, Anthony, McConnell and Bischoff; that at said time McLenegan announced to those present the facts respecting the litigation heretofore detailed, and in addition stated the contents of or read the letter of Marrin confirming the basis of the attorneys' charges, and that at said meeting the acts of McLenegan were ratified, approved and confirmed by the executive committee of the association and by the members represented at said meeting, including all the corporate defendants.

That on March 4, 1931, C. G. Anthony wrote to the railroad commission, requesting that the names of Pacific Freight Lines and its affiliated companies be eliminated from the amended complaint, and on March 5, 1931, Reginald Vaughan, attorney for said company, wrote a formal letter to the commission withdrawing those companies from the litigation.

That thereafter and prior to April 4, 1931, the Pacific Motor Transport Company filed with the railroad commission a tariff of proposed rates for transportation of freight in southern California, including one numbered 380, which would materially affect the earning capacity of Imperial Valley-Los Angeles Express, one of the subsidiaries of Pacific Freight Lines Company; that in connection with the matter a meeting took place between Mr. Anthony, his attorney Mr. Vaughan, Mr. Roehl and Mr. Marrin; that at that time Anthony requested the assistance of the attorneys and the use of Mr. Foster—a rate expert who had been employed by the attorneys to prepare data as to comparative transportation rates to be used in the trial of the proceeding in the railroad commission—in securing the suspension of item 380 of the proposed tariff; that the attorneys refused to accede to this request until the Pacific Freight Lines and its affiliated and subsidiary companies reentered the litigation as parties complainant; that Anthony thereupon agreed that said com-

panies would reenter said litigation and would participate in the payment of the fees and expenses in connection therewith; and that on May 7, 1931, he reentered their appearance as parties complainant in the railroad commission proceeding.

That the reasonable value of the services rendered by plaintiff's assignors to the defendants and each of them is the sum of $9,975; that the expenses incurred amount to $2,242.75; that the sum of $2,445 has been paid, leaving a balance due of $9,772.75, with interest.

Among the conclusions of law made by the court are that C. S. McLenegan, as president of the association, had express authority to commence litigation before the railroad commission in the name of the association and to employ attorneys to conduct said litigation, to agree with them concerning the amount of their compensation and to make the same a charge against the association and its members, and did so in the matter here involved; that on January 8, 1931, the association, its officers, its executive committee and its members, including the defendants herein, had knowledge of all the facts hereinbefore set out in the court's findings of fact, and with such knowledge approved, ratified and confirmed the acts of president McLenegan; that thereafter said association and its members were fully informed as to the progress of the matter, and that neither said association nor any of its members nor any of the defendants notified plaintiff's assignors that McLenegan had acted without or beyond his authority, but accepted the benefit of said services, and by said course of conduct of the association and of its members they each approved, ratified and confirmed the agreements and arrangements made by McLenegan on behalf of the association and its members with the plaintiff's assignors, and that said association and each of its members are estopped to deny the authority of McLenegan in so acting, and are estopped to deny their liability for the services rendered.

An additional conclusion of law is made concerning Pacific Freight Lines Company and its subsidiaries, and the Southern California Freight Lines and its subsidiaries, to the effect that with full and complete knowledge that all of said defendants were named as parties complainant in said proceeding, and that plaintiff's assignors expected to be paid for the services rendered and expenses incurred by them in connection with said proceeding by said defendants and each of

them, did give and grant to said president of said association, as agent of all of said defendants, express authority to employ plaintiff's assignors on their behalf, and expressly approved, ratified and confirmed all of the acts of said president.

Further conclusions of law were that an account was stated between plaintiff's assignors and each of the defendants in the amount of $9,772.75, which they each promised and agreed to pay; and that each of the defendants became indebted to plaintiff's assignors in the said sum for services rendered at their special instance and request, and which each promised to pay, and also became indebted to plaintiff's assignors in said sum as the reasonable value of said services.

From this enumeration it is seen that we have here—

(1) A finding of express authority in McLenegan as president of the association to commence the proceeding in the railroad commission and to employ attorneys at the association's expense;

(2) A finding that the association entered into an agreement with the attorneys establishing the scale of charges;

(3) A finding of express ratification by the association and its members at the meeting of January 8, 1931;

(4) A finding of implied ratification by the association;

(5) Findings of express ratification by both the Pacific Freight Lines and Southern California Freight Lines groups of defendants;

(6) A finding of implied ratification by the Pacific Freight Lines group;

(7) Findings of estoppel against the association and its members by acceptance of the benefit of the services of the attorneys, and of an account stated between the same.

Each of these findings is attacked by the appellants as not supported by the evidence.

From a careful study of the voluminous record and briefs in the case we have reached the following conclusions:

As to (1), there is no evidence in the record to sustain a finding of express authority in McLenegan as president of the association to initiate the litigation before the railroad commission on behalf of and at the expense of the association. His only authority to use the name of the association was that enjoyed by all members under the resolution hereinbefore mentioned, which by its terms made the right

or privilege conditional upon the member availing himself of it, himself bearing the attendant expense. And here it is pertinent to say that the attorneys were charged with notice of this limitation,—doubly so as it applied to McLenegan who, as president of the Pioneer Express Company, had a direct personal interest in bringing the association into the proceeding as he would thereby greatly diminish that company's ultimate liability for a proportion of the cost thereof.

██ As to (2), this finding is based on the letter from Marrin to McLenegan of December 12, 1930. This letter assumed that a contract of employment of both firms of attorneys had already been entered into, and it merely set forth their intended charges and stated that both Roehl and the writer felt that the sum of $5,000 "should be raised at this time". It was addressed to "Mr. C. S. McLenegan, c/o Pioneer Express Company" (as indeed all Marrin's communications during the litigation were), and the writer of the letter was aware that McLenegan had undertaken the task of collecting a fund to defray the expense thereof. ██
As to the firm of Sanborn, Roehl & Brookman, there is no evidence of their employment by McLenegan either on behalf of the Pioneer Express Company or of the association. The record shows that Roehl accepted the invitation of Marrin to become associated with his firm without any inquiry as to Marrin's authority, and it need hardly be said that an attorney at law has no authority as such to employ another attorney at the expense of his client. (3 Cal. Jur., p. 702; *Cormac v. Murphy*, 58 Cal. App. 366 [208 Pac. 360].) McLenegan himself, in explaining to members of the association the appearance of this firm in the case in soliciting their contributions, stated his understanding to be that they were appearing for two of the Pioneer Express Company's co-complainants.

██ As to (3), this is a finding of express ratification by the association and its members of plaintiff's assignors at the meeting of January 8, 1931. The respondents place great reliance upon this finding. In their brief they say: "This meeting of January 8th entirely changed the status of the parties and their legal responsibility. Up to this time it is questionable whether the attorneys had any claim against the Association or its members." We can find nothing in the evidence relating to this meeting that made any such change. That evidence shows without contradiction that it

was called by Secretary Shearer in compliance with a telegram sent to him by McLenegan. The latter testified that he was not sure whether he had asked Shearer to call a meeting of the executive committee, or named certain members of the association whom he knew to be such members. Shearer testified that he had not been requested to call the executive committee, but specified names only. In any event, out of a membership of nine on that committee only four were present and no official action of any kind was taken. At the meeting McLenegan recounted what he had done so far in the litigation; made it clear that he had commenced it on his own responsibility,—a fact known to some of those present through previous communications from McLenegan, —stated that it was going to cost much more than he had anticipated and appealed to those present for financial assistance, pointing out that they were as much interested in the question as he and the other carrier complainants. He read or stated to them the contents of Marrin's letter of December 12th relating to attorney fees and expenses; told them that members of the association in the north had agreed to contribute $2,500, being one-half of the amount mentioned in the letter, and asked that those present contribute the other half. While some present declined to make any contribution whatever, others agreed to contribute, and from the promises received McLenegan returned to San Francisco in the confident belief that the $2,500 he had requested would be raised, and he reported to the attorneys that he had "received assurances from the members there that they would undertake the payment of the $2,500 requested".

As to (4), a finding of implied ratification by the association. This finding is based upon the assumption that when the officers and members of the association learned that a proceeding had been instituted in the name of the association by McLenegan, and attorneys had been employed to conduct it, it became their duty to disavow the action of McLenegan and notify the attorneys that they would not be liable for the cost of the proceeding.

An essential element of the legal principle of ratification is knowledge by the principal of the unauthorized act of his agent and of its material circumstances. This is equally necessary whether the ratification be express or implied. And an express ratification without knowledge of all the material circumstances of the transaction is not binding on the prin-

cipal. Much less will the court imply ratification in the absence of such knowledge, since it is this knowledge which gives rise to the duty of disavowal, and without which there is nothing from which ratification may be implied. On this subject we quote from volume 2 of Corpus Juris Secundus, title Agency, section 42: ''Either at common law or under the terms of applicable statutory provisions, it is ordinarily required that for a ratification of an unauthorized act or transaction of an agent to be valid and binding, the principal shall have full knowledge at the time of ratification of all material facts and circumstances relating to the unuauthorized act or transaction, or that someone authorized to represent the principal, other than the agent whose act is being considered, have such knowledge. As a corollary to the rule that the principal must have knowledge of the material facts relating to the unauthorized act of his agent in order to ratify the same, it follows that notwithstanding a principal's approval of unauthorized acts which have been done on his behalf by another, if the material facts be either suppressed or unknown there is no valid ratification. In this respect it is immaterial whether the principal's want of knowledge is due to designed or undesigned concealment or wilful misrepresentation on the part of the agent or his mere inadvertence, or whether the question of ratification arises between the principal and the agent or arises with respect to third persons. . . . With respect to the manner in which unauthorized acts may be ratified, the general rule that full knowledge of the facts surrounding an agent's act is essential to a ratification thereof, is, as observed in sections 47–62 of this title, applicable to implied ratification of an agent's act by a principal.'' (2 C. J. S., Agency, sec. 42, p. 1081; *Allen* v. *San Francisco etc. Exchange,* 59 Cal. App. 93 [210 Pac. 41].)

The unauthorized act here found to have been ratified is the employment of the attorneys by McLenegan *on behalf of the association.* The record is plain that he, in common with his fellow members, had the privilege of using the association's name but at his own expense. In his efforts to secure funds by voluntary contribution he at all times made it clear that the association's responsibility had not been engaged; and there is no hint in the testimony that they were ever apprised otherwise, either by the attorneys or anyone else, until after the conclusion of the litigation. To this statement there is one qualification relating solely to the

Pacific Freight Lines group of defendants, which arises in the consideration of finding (5).

▇ (5), findings of express ratification by both the Pacific Freight Lines and Southern California Freight Lines groups. It will have been seen from our statement of what passed between Messrs. Anthony, Vaughan, Roehl and Marrin on April 6, 1931, that Anthony, now informed that the attorneys were expecting to be compensated by the association and its members, agreed, for a consideration moving from the attorneys, to contribute a share of the expense of the litigation. This the trial court construed to be an express ratification of their unauthorized employment, and we cannot say that it is not a legitimate inference from the testimony, and sufficient to sustain the finding as to the Pacific Freight Lines group of defendants, rendering the members of that group jointly and severally liable with Pioneer Express Company for the fees of Thelen & Marrin, and similarly liable with Valley Motor Lines, Inc., and United Motor Transport Lines, Inc., for the fees of Sanborn, Roehl & Brookman.

As to the Southern California Freight Lines group, we find the record bare of evidence to sustain a finding of express ratification as to them; nor, as to (6), do we find any evidence of an implied ratification by the Pacific Freight Lines group, which finding, however, if our conclusion as to an express ratification by this group is correct, becomes immaterial.

▇ The finding (7) of estoppel against the association and its members to deny liability is also without support in the evidence, since there is no evidence of any voluntary acceptance by them of the attorneys' services. That they knew that attorneys were rendering services in a proceeding involving a question in which they were interested, but brought at the instance of and for the account of other persons is not sufficient to constitute an acceptance of the benefit of those services. All the material facts of the transaction must be known. As is stated in the work just referred to, "In accordance with the rules heretofore discussed in section 42, knowledge on the part of the principal of the facts surrounding an unauthorized transaction is ordinarily necessary in order that benefits received by him shall amount to an implied ratification of acts done on his behalf." (2 C. J. S., Agency, sec. 49, p. 1101; *Corporation of America* v. *Harris,* 5 Cal. App. (2d) 452 [43 Pac. (2d) 307].)

A further point is urged in support of the appeal, namely, that the record establishes that the attorneys agreed to look exclusively for their compensation to the fund undertaken to be collected by McLenegan. We are of the opinion that the preponderance of the evidence shows this to be the fact, and it is consistent with the attitude taken by the attorneys up to the time of the completion of their services and the failure to collect sufficient money demonstrated that this source was not available. Thus McLenegan, who was plaintiff's own witness, testified: "It had been distinctly understood that the California Interurban Motor Transportation Association was not going to pay any sum out of their treasury. The members thereof were supposed to support the fight. (Q.) When was that distinctly understood? (A.) At the time the original complaint was filed. (Q.) That was stated to whom—Mr. Marrin? (A.) Yes." Contradictory testimony was given by Marrin in these words: "He did not tell me that the Association would not be financially responsible. He did say this; that he did not consider that the ordinary dues received by the treasury would be adequate to meet the cost of the litigation, and some special arrangement would have to be made to collect the amount of the cost of the litigation from the members of the Association." This testimony of Marrin, if accorded credence by the trial court, was sufficient to justify its finding against appellants' contention.

It is also contended by the appellants that the demand of plaintiff includes two items not warranted by the terms of employment of plaintiff's assignors, namely, 43 days' services at $25 per diem of W. H. Kessler, an attorney at law associated with or employed in the office of Sanborn, Roehl & Brookman, and 8 days of Gordon Johnson, an attorney at law associated with or employed in the office of Thelen & Marrin, at the same rate—a total of $1275. In the letter of Marrin to McLenegan of December 12, 1930, in which the cost of the litigation was estimated at $5,000, it was stated that there would be expense incurred in preparing necessary exhibits, and an expert or experts to act as witnesses in the case. For this purpose Grover C. Foster was employed, who prepared comparative tables of transportation rates, which were used as exhibits, and was also called as a witness in the proceeding before the railroad commission and testified. His charges are listed in the account as disbursements. and their

justness is not questioned. The work performed by Kessler and Johnson was in the preparation for and in the trial of the cause and was of a legal nature and rendered by them as attorneys at law. We have already had occasion to point out, *supra,* that an attorney has no authority by virtue of his retainer to employ counsel or assistants at the expense of his client. The inclusion in the account of sums paid or incurred for such services was clearly improper. The charge of $100 per day stipulated by Marrin for his services, and a similar charge for those of Roehl, must obviously be held to cover anything paid by them to their office assistants or others employed by them to perform work of a legal nature.

Finally, the court's finding of an account stated between the plaintiff's assignors and the association and its members is without support in the record. McLenegan was without authority to state an account, nor is it apparent that he purported to do so.

It follows from what we have said (1st), that the sum of $1275 should be deducted from the judgment; (2d) that as thus modified the judgment should be affirmed as to defendants Pacific Freight Lines Company, Commercial Dispatch Lines, Ltd., Consolidated Motor Transport Company, Motor Freight Terminal Company, San Joaquin Valley Transportation Company, Imperial Valley-Los Angeles Express, Los Angeles-San Pedro Transportation Company and Boulevard Express, Inc., and (3d) reversed as to all the remaining defendants. It is so ordered, and respondent to bear his own costs of the appeal.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 10, 1938, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 10, 1938.